MADDOX, et al v. TRUSTEES OF INTERNAL IMPROVEMENT FUND.
No. 70-163.
Circuit Court, Sarasota County.
December 18, 1970.

Dewey A. Dye, Jr. of Dye, Dye, Cleary & Scott, Bradenton, and G. Hunter Gibbons of Dart, Dickinson, O' Riorden, Gibbons & Quale, Sarasota, for the plaintiffs.

Philip S. Bennett, General Counsel, Trustees of Internal Improvement Fund, Tallahassee, for the defendants.

LYNN N. SILVERTOOTH, Circuit Judge.

*Final judgment:* This cause having come on for final hearing on October 30, 1970, at which time Sarasota County appeared and requested to be made a party to the proceedings, which request was granted by the court but thereafter the county was severed so that this matter proceeded to final hearing as to the defendant trustees of the internal improvement trust fund, and the parties at that time making a number of stipulations of fact, numerous witnesses having been presented, including professional surveyors and engineers, and over twenty documentary exhibits having been introduced including maps, surveys, charts, aerial photographs presenting an apparent complete history of the property in dispute from earliest public records to the present time, and the final hearing having been concluded the parties on November 10, 1970 presented extensive final arguments including a thorough review of numerous pertinent cases, all of which have been extremely helpful to the court in arriving at its decision and for which the court extends its appreciation to counsel for both parties, and the court being otherwise fully advised in the premises the following findings of fact and conclusion of law are entered —

### Findings of fact

The plaintiffs claim title to that portion of government lot 1, section 12, township 37 south, range 17 east, lying north of Hidden Harbor Addition Subdivision, as per plat thereof recorded in plat book 19, pages 5 and 5-A, public records of Sarasota County, including riparian rights thereunto appertaining, by virtue of a U. S. Government patent issued in 1892 to Asa Phelps, plaintiffs' predecessor in title. The land in question is located on Siesta Key in Sarasota County.

The property is essentially triangular in shape, being bounded on the east by the waters of Roberts Bay, an arm of Sarasota Bay, on the west by the U. S. Government survey lot line, and on the south by an artificial channel dredged a number of years ago from Hidden Harbor Subdivision through the shoreline out into the navigable waters of Roberts Bay. This artificial channel is about 30 feet wide and 4 or 5 feet deep and terminates in a yacht basin located south of land claimed by plaintiff and developed as part of Hidden Harbor Subdivision which lies to the south of plaintiffs' land.

The easterly shoreline of the land in question commences on the south at the dredged channel just described and runs generally north and northwest along the shore of Roberts Bay until this shoreline intersects the west boundary of the subject tract, that is, the west line of government lot 1. This shoreline is generally vegetated

with mangroves and Australian pines and, approximately 100 feet south of the north corner of the property, there is a break in the mangrove shoreline approximately 30 feet wide. A coon oyster bar extends across this entire opening in the mangroves. This bar is covered by waters of varying depths at high tide and is exposed at low tides.

Tide water flows through both the dredged channel on the south and across the bar and through the natural opening on the north. In the interior of the property and behind these two openings lies a small, irregularly shaped bayou which is several acres in size. The entire perimeter of the interior bayou is vegetated with mangroves, and numerous clumps and islands of mangroves are found throughout this shallow bayou. Some of the witnesses referred to this area as two bayous, that is, a northerly bayou connected with Roberts Bay through the small natural opening and the southerly bayou connected to Roberts Bay by the artificial dredged channel serving Hidden Harbor Subdivision.

It is the ownership of the land lying within this interior bayou which is covered by water at high tides and dry at low tides which is the crux of this litigation.

Prior to institution of this suit, plaintiffs applied to the Sarasota County board of county commissioners sitting as the Sarasota water and navigation control authority, hereinafter called the board, for a work permit to adapt the land in question to residential use. It has been stipulated by the parties and the court finds as a fact that the application by the plaintiffs for a work permit was administratively processed to the point where the board required plaintiffs to pay the prescribed fee for an ecological survey pursuant to chapter 253, Florida Statutes. The plaintiffs refused to pay the fee on the ground that the land which they sought to develop was private property not immediately adjoining navigable water and therefore chapter 253 was not applicable. The board refused to further process the plaintiffs' application for a work permit without payment of such fee.

It has also been stipulated by the parties and the court finds as a fact that the plaintiffs thereupon requested of the defendants either a disclaimer or a quit claim deed of any interest which the defendants might have in the property which is the subject matter of this controversy. The defendants sent a representative to inspect the property in question and, as a result of this inspection, claimed as sovereignty land that portion of government lot 1 which is subject to the daily ebb and flow of the tides, including the shallow submerged land lying within the interior bayou above described. Plaintiffs thereafter filed this action to quiet title to the land and

for declaratory relief concerning the applicability of chapter 253, Florida Statutes, to this particular controversy.

It has been stipulated and the court finds that the plaintiffs are apparent record owners of the land in question and deraign their title from the U. S. Government patent issued to Asa Phelps.

As a part of their evidence, the plaintiffs have introduced a copy of the original contract and survey notes of James Apthorp who surveyed the property in 1875 for the U. S. Government. A plotting of the field notes of the Apthorp survey on a recent aerial photograph of the land reveals that the topographical features today fit almost exactly with those described in the field notes. Comparison of early topographical charts and hydrographic charts with recent aerial photographs, all a part of the record in this case, reveals that the nature of the land except for the dredged channel located on the south boundary of the land has changed little, if any, since the time of the 1875 Apthorp survey.

In making his original survey, Mr. Apthorp was required to comply with a manual of surveying instructions issued by the U. S. surveyor general. These instructions, also a part of the record, require, inter alia, that the surveyor meander the shores of all navigable lakes, rivers, bayous, etc. Under the terms of his contract, the government surveyor was not required to meander bayous, streams, marshes, and shallow flats which were not, in fact, navigable. Mr. Apthorp meandered the eastern boundary of government lot 1 and a plotting of his field notes reveal that this meander line lies generally along the shore of Roberts Bay as it exists today. In places the meander line runs down the shore line; at other points it touches the shoreline and at still other points the meander line is located a short distance offshore. The break in the mangroves near the north end of the land in controversy, previously referred to, is described and located with surprising accuracy in the Apthorp survey of 1875. Based upon this survey and the other evidence presented, it is the finding of the court that Mr. Apthorp did, in 1875, accurately survey government lot 1 and did meander the line of demarcation between land and navigable water as was required under the terms of his contract with the United States. It is clear that Mr. Apthorp intended that the easterly boundary of government lot 1 was to be the westerly shore of the navigable waters of Roberts Bay.

The court further finds that Mr. Apthorp did not meander the shallow interior bayou, ownership of which is the subject matter of this suit. Thus, it clearly appears that the bayou in question lies wholly within government lot 1 as surveyed by Mr. Apthorp.

The failure of Mr. Apthorp to meander the inner bayou indicates that in 1875 this inner bayou was not the subject of useful public navigation, was not susceptible to useful public navigation, and was not navigable in fact. The failure of the U. S. coast and geodetic survey to take soundings in the bayou when their survey was made in 1883 certainly bears this out.

Asa Phelps, plaintiffs' predecessor in title, entered on the land in 1882 for the purpose of homesteading. The evidence reveals that he built a house and cleared and fenced a portion of the land.

On April 27, 1885, the state of Florida promulgated what has been identified as "List 30" wherein the state claimed title to this and other specific tracts of land under the Swamp Lands Act of 1850. The significant thing about List 30 is the fact that in 1885 the state claimed the property in question as swamp and overflowed land; now they are claiming the same property as sovereignty land. Asa Phelps, who was then homesteading government lot 1, contested the state's claim and a formal hearing was held at Sarasota on July 13, 1886. Notice of this hearing was served on the governor of Florida. Testimony taken at this hearing and at the later homestead hearing is of interest because various witnesses describe the nature and character of the land then as being essentially the same as the court finds the land to exist today, further bearing out the accuracy of the Apthorp survey.

The hearing examiner found that the land in question was not swamp and overflowed land and recommended that the claim of the state to the land be rejected. The findings of the hearing examiner were approved and the United States issued Letter "K" formally denying the claim of the state of Florida and giving the state the right to appeal the decision. No appeal was taken.

Asa Phelps thereafter proved his homestead rights and on April 29, 1892, the United States issued a patent to Mr. Phelps.

Pursuant to chapter 4322 (18) Laws of 1895 (Florida), the land was entered on the tax rolls of Manatee County in 1896. The land has thereafter been taxed as private property. In this regard, the plat of government lot 1 filed with the Apthorp survey shows it to be fifty-three and a fraction acres. The tax rolls reveal that the entire tract of fifty-three and a fraction acres was assessed as private property in 1896 and thereafter taxes were paid thereon by various private individuals.

The court also finds that all of government lot 1 has been taxed as private land on an acreage basis and that until 1940 the defendant benefited directly from the payment of these taxes, or a portion thereof, to the state of Florida.

With regard to the character of the land as it presently exists, the evidence submitted by both parties is relatively consistent. It is clear that the interior bayou, the ownership of which is the crux of this litigation, is affected by the daily ebb and flow of the tides. Tide water flows in through the break in the mangroves on the north and through the artificially dredged channel on the south covering the interior bayou with water at high tide. Tide water flows out on the change of the tides leaving this inner bayou dry at low tides except for scattered potholes. It is possible, with some difficulty, to pole a small skiff through the break in the mangroves into the bayou at high tide. The bayou cannot be navigated by any means at low tide. The court thus finds that the inner bayou is not navigable in fact and not suitable for any useful purposes of public navigation.

With regard to the line of mean high tide as it relates to the shoreline lying adjacent to Roberts Bay (the eastern boundary of government lot 1), competent surveyors representing both the plaintiffs and the defendants agree that, due to the topography of the land, that is, its extremely low lying nature, and the mangroves which grow along the water's edge, it is impossible to locate with any legal precision the line of mean high tide. The meander line of the original Apthorp survey can, however, be plotted through the use of the original field notes. The defendants' witness Passaloqua, a surveyor and civil engineer, has plotted, based upon several sightings with a level and transit, a line which he considers to represent the average line of mean high tide (def. ex. 5).

His procedure was to locate a number of individual points along the mangrove shoreline but back into the mangroves at the elevation he deemed to represent mean high water at each particular point. Each of these points is represented on his map as a dot. It was not possible to see from one point to the next on a direct line of sight because of the dense growth of the mangroves. Then, back in his office, he connected these points together with a line drawn on his survey map as a matter of personal judgment. The court notes that several of the observed points are over one hundred feet apart and it would appear that, as the points actually observed get further apart, the "judgment" line connecting the points must obviously become more imprecise. Be that as it may, this is the best evidence the court has before it of the location of any actual line of mean high water.

Insofar as this plotting relates to the easterly boundary of government lot 1 lying adjacent to Roberts Bay, the court finds that this plotting, where completed by the surveyor, best represents the line of mean high tide and this line if extended along the westerly shore

of Roberts Bay and across the mouth of the northerly opening leading into the shallow interior bayou represents the easterly boundary of plaintiffs' ownership. The court, by the same process as employed by Mr. Passaloqua, connects the two observed elevations located most near and lying each side of the natural break in the shoreline and thus substantially completes plaintiffs' easterly boundary line. Along that portion of the easterly shoreline of plaintiffs' property where the line of mean high tide was not indicated on the Passaloqua sketch, the court finds that the U. S. Government survey meander line of Mr. Apthorp best represents the line of mean high tide and thus the balance of plaintiffs' easterly boundary. The Apthorp line and the Passaloqua lines can be connected by extending them until they intersect. The court has prepared a sketch upon which is shown the various lines pertinent to this case and upon which the court has marked in red the entire line thus found to constitute the plaintiffs' easterly boundary line. This sketch is adopted by the court and by reference made a part of this finding.

Lying east of the line just above located and identified lie the navigable waters of Roberts Bay.

The parties have stipulated and the court finds as a fact that Sarasota County has established a bulkhead line and that all of the land in question, that is, all of the land determined by the court to be owned by the plaintiffs, is behind or landward of this established bulkhead line.

The parties have stipulated and the court finds as a fact that the property identified as tract 2 in the complaint is free of any claim of the defendants as all of the property located within tract 2 is clearly upland property lying landward of any body of water subject to any tidal action.

## Conclusions of law

The court finds that land underlying a small non-navigable body of water which was included within the perimeter of the U. S. Government survey and not meandered as a navigable body of water and which water is not navigable in fact is subject to private ownership. Clement v. Watson, 58 So. 25 (1912).

The evidence clearly shows that the body of water constituting the interior lagoon within the perimeter of plaintiffs' property was a small, shallow area which filled up with water at high tide but was essentially dry or bare at low tide. One could navigate through the area only at high tide and then only by poling a shallowdraft, flat-bottomed skiff, which would in places have to be pushed through the mangroves in order to move from one area of the

bayou to another. It is possible to enter and leave the bayou at certain periods of high water with a small outboard motor, but this would be an isolated rather than a regular occurrence. The court holds that the evidence clearly shows that the interior bayou is not navigable in fact and is thus not navigable in law. In so holding, the court adopts the following language from the case of Baker v. State, 87 So.2d 497 (S.Ct. 1956), as being applicable to the bayou in question here —

> ". . . to be navigable a body of water must be permanent in character, of sufficient size and so situated that it may be used for purposes common or useful to the public in the locality before it will be regarded as navigable."

The defendants have apparently based their theory of ownership of the property within the interior bayou on the fact that much of this area is tidal in character and is thus covered and uncovered by the daily ebb and flow of the tide. They would apparently claim the land underlying this small bayou, even though the waters within the bayou are clearly not navigable, solely because the waters are tidal. Counsel for both parties have extensively briefed the law on this subject and presented numerous authorities to the court in support of their respective positions. It appears from a study of these authorities however, that the concept of sovereign state ownership of property subject to the daily ebb and flow of the tide relates only to such land as borders immediately upon a navigable body of water. It is clear that Florida has adopted and consistently followed the rule that waters are not regarded as navigable merely because they are affected by the tides. See Clement v. Watson, supra; Lopez v. Smith, 109 So.2d 176 (2d DCA 1959); City of Tarpon Springs v. Smith, 88 So. 613 (S.Ct. 1921). See also the discussion of this question in Professor Maloney's excellent work, *Water Law and Administration.*

The court having found that the area within the interior bayou was encompassed within the original government survey and was patented to plaintiffs' predecessor in title by the United States Government and the water within such bayou being clearly non-navigable in fact and in law, it follows that plaintiffs own the property within and under the bayou the same as any other property patented into private ownership.

The conclusion reached here is not unlike that reached in South Venice Corporation v. Caspersen, 229 So.2d 652 (2d D.C.A. 1970). This, too, was a Sarasota County case involving disputed ownership of certain submerged lands in Lemon Bay encompassed within the original government survey of fractional section 32, township 39 south, range 19 East, and patented into private ownership, even

though a portion of the land in question was covered by the waters of Lemon Bay. It was there held that the portion of Lemon Bay which covered the property in question was non-navigable and therefore the land underlying that portion of the bay was not sovereignty land and it had properly been patented into private ownership.

The court does find, however, that the defendants do have an interest in the lands covered by tide water along the easterly edge of plaintiffs' property, but this is because of the fact that the waters in question are part of the navigable waters of Roberts Bay, not because of the mere fact that the waters are tide waters. The state owns the submerged land underlying navigable waters in its sovereign capacity as the state. This sovereign submerged land extends to the shore of lands which immediately border upon such navigable waters and includes the area lying between the high and low water marks along such shore. Here again, it is the navigability of the body of water immediately adjacent to such shoreline upon which the state's interest is founded, not the fact that such shore is covered and uncovered by the daily ebb and flow of the tide. This distinction was clearly made by Justice Whitfield in a number of his excellent opinions on this subject, but more specifically the case of City of Tarpon Springs v. Smith, supra.

The court finds that Justice Whitfield's opinion in Clement v. Watson, supra, is particularly applicable to the present case in the following statement —

"It is agreed that the title to the property was derived indirectly from the United States government; that the title covers and includes a cove where the alleged assault was made; that the cove is surrounded by the Watson property, except the mouth of the cove, which meets the waters of New River Sound; that the mouth of the cove is about 300 feet wide; that a sand bar which runs across the mouth of the cove is almost bare at low tide, but is covered at high tide; that the waters in the cove are subject to the ebb and flow of the tide. It also appears that originally the waters in the cove were very shallow and not useful for the public purpose of navigation; that the cove is small and narrows from its mouth to its terminus on the Watson lands; that Watson's predecessor in title dredged a channel 16 feet wide and a place for a yacht to lay in at low water in the cove so as to make the wharf accessible by small craft; that the Watson residence is near the cove, and the family wharf extends into the cove from the land.

"While the navigable waters in the state, and the lands under such waters, including the shore, or space between high and low water marks, are held by the state for the purpose of navigation

and other public uses, subject to lawful governmental regulation, yet this rule is applicable only to such waters as by reason of their size, depth, and other conditions are in fact capable of navigation for useful public purposes. Waters are not under our law regarded as navigable merely because they are affected by the tides.

"The shore of navigable waters which the sovereign holds for public uses is the land that borders on navigable waters and lies between ordinary high and ordinary low water mark. This does not include lands that do not immediately border on the navigable waters, and that are covered by water not capable of navigation for useful public purposes, such as mud flats, shallow inlets, and lowlands covered more or less by water permanently or at intervals, where the waters thereon are not in their ordinary state useful for public navigation. Lands not covered by navigable waters and not included in the shore space between ordinary high and low water marks immediately bordering on navigable waters are the subjects of private ownership, at least when the public rights of navigation, etc., are not thereby unlawfully impaired."

The court finds that by formal action the defendants in 1885 asserted ownership of the same property which is the subject matter of this litigation by its claim requesting a United States patent to the land under the Swamp Lands Act of 1850. Asa Phelps, the ultimate patentee, contracted this claim. In the proceedings which followed the state's claim failed and the patent was ultimately issued to Phelps. The defendants here representing the state of Florida now claim the disputed property as sovereignty submerged land. These two positions are irreconcilable. If it is one, it cannot be the other and vice versa.

The United States patent having issued to Asa Phelps in 1892 on the disputed property, the state of Florida thereafter caused the disputed property to be entered upon the tax rolls of Manatee County where it was thereafter taxed as private property. Until 1940, a portion of these taxes flowed directly in the coffers of the state of Florida. The court holds that the principles announced by the Supreme Court in Trustees of the Internal Improvement Trust Fund v. Lobean, 127 So.2d 98 (1961), are specifically applicable in this case.

The court, in so finding, does not rely upon this equivocal conduct on the part of the state of Florida to find in behalf of plaintiffs' ownership. This court is of the opinion that plaintiffs' title to that part of the disputed property lying westerly of the navigable waters of Roberts Bay is a good title not founded upon estoppel. The court

merely notes that the conduct of the state of Florida as evidenced by its official acts since 1885 places the defendants in an extremely poor position to be questioning the validity of plaintiffs' title. As Justice Drew noted in his special concurring opinion in *Lobean,* supra —

". . . Under the circumstances presented by this record, a private citizen would have been estopped. I can think of no reason why the State should not be held to the same degree of conduct."

With respect to the applicability of chapter 253, Florida Statutes, to the land in question, a study of the applicable portions of that chapter make it clear that the various provisions thereof relating to dredging, filling, bulkheading, and similar provisions relate only to such activities as affect navigable waters. For instance, §253.122 relating to title to tidal lands specifically refers to —

"all sovereignty title and submerged bottom lands . . . located in the navigable waters . . ."

§253.122 relating to bulkheads specifically refers to location of —

". . . . a bulkhead line or lines adjacent to or offshore from any existing lands of islands bordering on or being in the navigable waters . . ."

This section further provides as follows —

"Any bulkhead line when so fixed or ascertained and established shall represent the line beyond which a further extension, creating, or filling of land or islands outward into the waters of the county shall be deemed an interference with the servitude in favor of commerce, navigation, and conservation of natural resources, with which the navigable waters of this state are unalienably impressed."

§253.123 relating to dredging specifically provides that no land shall be filled out into "navigable waters of the state" and that fill material cannot be removed "from the navigable waters of the state" without the appropriate permit. §253.124 relating to the filing in of lands specifically provides —

"Any private person, firm, or corporation desiring to construct islands or add to or extend existing lands or islands located in the navigable waters of the state . . ."

There are similar other conditions in chapter 253, but it is clear that the primary thrust of the entire chapter is directed to activities occurring in, upon, and along the navigable waters of the state of Florida.

Thus, the court finds from the evidence and authorities presented that chapter 253, Florida Statutes, applies only to that portion of plaintiffs' property which immediately adjoins the navigable waters of Roberts Bay, i.e., the east boundary of government lot 1 as herein located by the court. So long as the plaintiffs do not alter any part of the shoreline lying easterly of the described line, such as by attempting to dredge or fill such property, they are not required to comply with the provisions of chapter 253, Florida Statutes. The court specifically finds that compliance with chapter 253, Florida Statutes, is not required in the proposed development of the interior portions of government lot 1.

The court also finds that §271.09(2), Florida Statutes, is applicable to the land of the plaintiffs and that the inner bayou is as a matter of fact and also as a matter of law not navigable because the same was patented by the United States to Asa Phelps without reservation of public rights in and to said waters.

The foregoing considered, it is thereupon ordered and adjudged —

A. The court has jurisdiction of the parties and subject matter of this controversy.

B. That the plaintiffs, William N. Maddox, Jr. and William F. McGinness, Jr., are the owners in fee simple free and clear of all claims, rights, title and interest of the defendants, trustees of the internal improvement trust fund of the state of Fliorida, and all persons claiming by, through or under them, or any of them, in and to the following described property located in Sarasota County, Florida, to-wit —

That portion of government lot 1, section 12, township 37 S, range 17 E, lying north of Hidden Harbor Addition Subdivision as per plat thereof recorded in plat book 19 pages 5 and 5a, public records of Sarasota County, Florida, including riparian rights thereunto appertaining.

C. That the easterly boundary line of that part of government lot 1 above described pertinent to the subject matter of this suit is located and marked in red upon the sketch attached hereto and by reference made a part of this final judgment.

D. That chapter 253, Florida Statutes, relating to requirements for biological surveys and ecological studies and dredge and fill permits under certain circumstances has no application to plaintiffs' property herein last above described lying westerly of the line identified on the attached sketch.

E. Costs are hereby awarded in behalf of the plaintiffs and against the defendants subject to such later proceedings that may be held to determine the reasonable amount of such costs and taxability of particular items of costs.